# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| NAVIENT SOLUTIONS, LLC, | ) |
| | ) |
| Plaintiff/ | ) |
| Counterclaim Defendant, | ) |
| | ) |
| v. | ) C.A. No. N20C-04-005 AML |
| | ) |
| BPG OFFICE PARTNERS XIII IRON | ) |
| HILL LLC and OFFICE PARTNERS | ) |
| XIII IRON HILL LLC, | ) |
| | ) |
| Defendants/ | ) |
| Counterclaim Plaintiffs. | ) |

Submitted: February 10, 2023
Decided: April 27, 2023

## POST-TRIAL MEMORANDUM OPINION

R. Karl Hill, Esq., and James S. Green, Jr., Esq. of SEITZ, VAN OGTROP & GREEN, P.A., Wilmington, Delaware, *Attorneys for Plaintiff/Counterclaim Defendant Navient Solutions, LLC*.

Jeffrey M. Weiner, Esq. of LAW OFFICES OF JEFFREY M. WEINER, Wilmington, Delaware, *Attorney for Defendants/Counterclaim Plaintiffs BPG Office Partners XIII Iron Hill LLC and Office Partners XIII Iron Hill LLC*.

**LeGrow, J.**

The parties to this action entered into a lease agreement for a commercial property in Delaware. The parties' relationship throughout most of the lease term appeared civil and cooperative. Near the end of the lease term, the tenant paid to replace a cooling tower at the property and demanded repayment of the unamortized costs from the landlord as required by the lease. The landlord, however, refused to pay. Shortly thereafter, the tenant initiated this action seeking reimbursement for the costs it expended to replace the cooling tower, and the landlord asserted a counterclaim against the tenant. The counterclaim sought costs for items at the property that the tenant allegedly was required to repair or replace during the term of the lease.

The parties and the Court undertook a three-day bench trial. Before trial began, the landlord conceded it owed the tenant the cost for the replacement cooling tower. The tenant therefore prevails on its breach claim. Trial focused on the landlord's counterclaim against the tenant. After considering all the evidence, the Court enters judgment for the landlord with respect to replacement costs for two of the four item groups at issue in the counterclaim. But the landlord did not carry its burden with respect to the other two item groups. The Court therefore will enter partial judgment in the tenant's favor on the counterclaim. The Court additionally finds the tenant is the prevailing party and is entitled to attorneys' fees and expenses under the terms of the commercial lease.

1

# I. BACKGROUND

Trial took place in this action over the course of three days. Twelve witnesses testified virtually. The parties submitted post-trial briefs addressing factual and legal issues. These are the facts as the Court finds them after assessing the witnesses' credibility and weighing the evidence.[1]

## A. The Parties

Plaintiff/Counterclaim Defendant Navient Solutions, LLC ("Navient") filed this commercial landlord-tenant breach of contract action.[2] Navient is a Delaware limited liability company and was formerly known as Sallie Mae, Inc.[3] Defendants/Counterclaim Plaintiffs BPG Office Partners XIII Iron Hill LLC and Office Partners XIII Iron Hill LLC (collectively, "BPG") are two Delaware limited liability companies.[4] BPG asserted a breach of contract counterclaim against Navient.[5]

## B. The Commercial Property and the Lease Agreement

The Iron Hill Corporate Center is a three-building office complex in Newark, Delaware (the "Office Complex").[6] The Office Complex was constructed between

---

[1] The factual background in this post-trial decision cites: C.A. No. N20C-04-005 AML docket entries (by "D.I." number); trial exhibits (by "JX" number); the trial transcript ("Trial Tr." by day "I-III"); and stipulated facts set forth in the parties' Joint Pre-Trial Order ("PTO").

[2] *See* Compl. ¶ 1 (D.I. 1).

[3] *Id.* ¶ 2.

[4] *Id.* ¶¶ 3-4.

[5] PTO § 2(aa).

[6] *Id.* § 2(a).

1990 and 1992 and has three wings.[7]  BPG acquired the Office Complex on March 31, 2008.[8]  On the same date, BPG leased one wing of the Office Complex—the "Blue Wing"—to Bank of America.[9]  In August 2010, Bank of America subleased the Blue Wing to Sallie Mae, Inc. with anticipated delivery to occur on or before November 1, 2010.[10]  On November 20, 2012, Sallie Mae, Inc. (now Navient) and BPG entered into a commercial lease agreement for the Blue Wing with Navient as the tenant and BPG as the landlord (the "Lease Agreement").[11]  The Blue Wing is the subject of this action; it is a three-floor building with approximately 85,563 rentable square feet.[12]

## C. Language of the Lease Agreement

The claims and counterclaims in this action assert various breaches of the Lease Agreement.  Several provisions in the Lease Agreement are at issue in this case.  Section 4 of the Lease Agreement, titled "Condition of Premises," explains Navient inspected the Blue Wing, accepted it (less the "Common Areas") in an "as-is" condition, and did not rely on any representations by BPG.[13]  Section 4 specifically states:

---

[7] *Id.* § 2(b).
[8] *Id.* § 2(c).
[9] *See id.* § 2(c)-(d); Defs.'/Countercl. Pls.' Post-Trial Opening Br. at 4 (D.I. 57).
[10] PTO § 2(d); JX 2.
[11] PTO § 2(f); JX 3 (a copy of the Lease Agreement).
[12] PTO § 2(e).
[13] JX 3 § 4.

Subject to [BPG's] obligation, if any, to perform Landlord's Tenant Improvement Work, the Premises [defined as the Blue Wing, "exclusive of the Common Areas"] are accepted by [Navient] in 'as-is' condition and configuration without any representations or warranties by [BPG]. [Navient] agrees that it has inspected the Premises and the [Blue Wing] and has agreed to lease the Premises as a result of [Navient's] own investigations and reviews, and not in reliance of any representation or warranty made by [BPG] or by anyone on [BPG's] behalf.[14]

Section 6 is titled "Surrender; Alterations and Repairs." Section 6(a) governs part of Navient's obligations at the expiration of the Lease Agreement.[15] Section 6(a) states in pertinent part: "At the expiration or other termination of this Lease, [Navient] shall deliver the Premises with all improvements located thereon (except as otherwise herein provided) in good repair and condition, reasonable wear and tear resulting from the Permitted Use and damage due to casualty expected . . . ."[16]

Section 6(i) establishes Navient's obligations relating to repairs, replacements, and restorations. Section 6(i) states:

[Navient] shall take good care of the Premises and keep them free from waste and nuisance of any kind. [Navient] shall keep the Premises, including the Alterations installed by [Navient], in good condition and shall undertake and be responsible for all repairs, replacements, restorations and renewals necessary to keep and maintain such good condition, except as provided in Section 15(g) below. If [Navient] fails to commence the repairs described above within ten (10) business days after the occurrence of the damage or injury, [BPG] may, upon five (5) business days' prior written notice to [Navient], at its option to make such repairs, and [Navient] shall, within thirty (30) days of its receipt

---

[14] *Id.*; *see also id.* at Basic Lease Provisions (3) (defining "Premises").
[15] JX 3 § 6(a).
[16] *Id.*

4

of [BPG's] written demand therefor (together with reasonable supporting documentation), pay [BPG] the cost therefor. The performance by [Navient] of its obligations to maintain and make repairs to any Building Systems within and exclusively serving the Premises (for which [Navient] is responsible pursuant to the terms hereof) shall be conducted only by contractors and subcontractors reasonably approved by [BPG] in writing.[17]

Section 6(j) memorializes Navient's obligations to repair the Blue Wing and caps unamortized reimbursements. Section 6(j)(i) states Navient:

agrees, at [Navient's] sole cost and expense, to maintain, repair and replace all Building Systems exclusively serving the Building in good order and repair, and [BPG] hereby grants [Navient] an irrevocable license during the Term of the Lease . . . to access and modify all portions of the Building . . . necessary to perform [Navient's] obligations hereunder . . . ; provided, however, that [Navient] shall repair any damage to the Building or Land caused by the existence of such rights (normal wear and tear and damage due to casualty expected). In the event all or any portion of the Building Systems exclusively serving the Building requires replacement during the Term, [Navient] shall undertake the same at its sole cost and expense, and such replacement shall be accomplished, in a Class-A manner, using materials and equipment consistent with that found in comparable office buildings in the Wilmington, Delaware metropolitan area. However, notwithstanding the foregoing . . . , if (1) the portion of the Building Systems being replaced (the "Replacement Item") has a useful life extending beyond the Lease Term . . . , and (2) the cost of such Replacement Item would otherwise constitute a capital repair or replacement cost [if] such items were purchased by or on behalf of [BPG], then the cost of such Replacement Item shall be amortized over the useful life thereof at a rate of eight percent (8%) per annum, and [Navient] shall receive an amount from [BPG] at the expiration or sooner termination of the Lease equal to the then-remaining unamortized cost of such Replacement Item (the "Unamortized Reimbursement").[18]

---

[17] *Id.* § 6(i).
[18] *Id.* § 6(j)(i).

Section 6(j)(ii) further explains Unamortized Reimbursements and states:

Notwithstanding the foregoing . . . , in no event shall the Unamortized Reimbursement exceed $300,000 in the aggregate; provided, however, that so long as such replacement otherwise satisfies clauses (1) and (2) of subsection [(j)](i) above, the foregoing limitation shall not apply with respect to any replacement of the cooling tower (and its component parts) serving the Premises HVAC systems, the cost of which shall be amortized over the useful life thereof at a rate of eight percent (8%) per annum and [Navient] shall receive an amount from [BPG] at the expiration or sooner termination of the Lease equal to the then-remaining unamortized cost thereof.[19]

Exhibit E to the Lease Agreement creates a "Tenant Fund" that Navient was permitted to use for improvements to the premises. Exhibit E states:

(a) [BPG] hereby grants to [Navient] an allowance for completion of the Tenant Improvements in an amount up to, but not in excess of One Million Two Hundred Eighty-three Thousand Five Hundred Twenty Dollars ($1,283,520.00) (the "Tenant Fund"). In addition to the Tenant Fund, [BPG] shall provide [Navient] (upon the presentation of reasonably acceptable documentation) with an allowance of up to, but not in excess of, Six Thousand Eight Hundred Forty-five and 44/100 Dollars ($6,845.44) for an architectural "test-fit". The Tenant Fund shall be used for: (i) Payment of the cost of preparing the Space Plans and Working Drawings, including architectural/design, mechanical, electrical, plumbing and structural drawings and of all other aspects necessary to complete the Space Plans and Working Drawings; (ii) The payment of plan checking by government authorities and for permits and license fees relating to construction of the Tenant Improvements; and (iii) Construction and Installation of the Tenant Improvements, including, without limitation, the following: (aa) Installation within the Premises of all partitioning, doors, floor coverings, ceilings, wall coverings and painting, millwork and similar items; (bb) All electrical wiring, lighting, fixtures, outlets and switches, and other electrical work to be installed within the Premises; (cc) The furnishing and installation of all duct work, terminal boxes, diffusers and accessories required for

---

[19] *Id.* § 6(j)(ii).

the completion of the heating, ventilation and air conditioning systems within the Premises, including the cost of meter and key control for after-hour air conditioning; (dd) Any additional [Navient] requirements including, but not limited to, odor control, special heating, ventilation and air conditioning, noise or vibration control or other special systems; (ee) All fire and life safety control systems such as fire, walls, sprinklers, halon, fire alarms, including piping, wiring and accessories, installed within the Premises; (ff) All plumbing, fixtures, pipes and accessories to be installed within the Premises; (gg) Testing and inspection costs; and (hh) General conditions and contractor's fees.[20]

Section 13 of the Lease Agreement, titled "Remedies and Termination Upon Tenant Default," defines BPG's options if Navient defaulted under the Lease. Section 13(b)(vi) states:

> (b) During the existence of an Event of Default, [BPG] shall have the right (but not any duty) to exercise one or more of the following remedies, as well as any other remedies available at law or in equity: (vi) [BPG] may enter upon the Premises, without being liable for prosecution or any claim of damages therefor, and cure the default, and [Navient] agrees to reimburse [BPG] on demand for any expenses including, without limitation, reasonable attorneys' fees which [BPG] may incur in effecting such cure and [Navient] further agrees [BPG] shall not be liable for any damages resulting to [Navient] from such action.[21]

In a similar vein regarding legal fees, Section 28(q) states: "In the event of any litigation between [BPG] and [Navient], the unsuccessful party as determined by a court of competent jurisdiction shall reimburse the successful party for all legal

---

[20] *Id.*, Ex. E § II(3)(a).
[21] *Id.* § 13(b)(vi).

7

fees and expenses incurred by the successful party in prosecuting or defending any such action."[22]

**D. Maintenance at the Blue Wing of the Office Complex**

Navient services student loans; in connection with that operation, Navient operated a call center at the Blue Wing.[23] At its peak, the Blue Wing housed between 600 and 700 Navient employees.[24] Navient occupied all three floors of the Blue Wing until it started to reduce operations there in 2017.[25] Navient first vacated the third floor; it then vacated the second floor.[26] Navient fully vacated the Blue Wing by the end of 2019, which gave Navient enough time to remove furniture and equipment before the Lease Agreement terminated on February 29, 2020.[27] BPG's counterclaim in this action relates to four areas of Blue Wing equipment and maintenance: (1) a transformer, (2) heat pumps, (3) rooftop fresh air units, and (4) elevators.

**1. The Cooling Tower**

Navient initiated this action and brought a claim for breach of the Lease Agreement.[28] Specifically, Navient replaced the cooling tower and its component

---

[22] *Id.* § 28(q).
[23] Trial Tr. II at 54-55 (Muffler).
[24] *Id.* at 55 (Muffler).
[25] PTO § 2(o).
[26] *Id.*
[27] *See* Trial Tr. II at 57 (Muffler); *see also* PTO § 2(x) (stipulating that the Lease term expired February 29, 2020).
[28] Compl. ¶¶ 10-19.

parts between April and May 2019.[29]  The total unamortized cost of replacing the cooling tower and its component parts was $503,822.72.[30]  The Lease Agreement specified the cost of the replacement "shall be amortized over the useful life thereof at a rate of eight (8%) per annum and [Navient] shall receive an amount from [BPG] at the expiration or sooner termination of the Lease equal to the then-remaining unamortized cost of such Replacement Item [*i.e.*, the cooling tower]."[31]

On January 28, 2020, Navient demanded $503,822.72 from BPG for the then-unamortized cost of the cooling tower replacement.[32]  The Lease Agreement states BPG "shall be deemed to be in default of this Lease if [BPG] fails to make any payments to [Navient] required under this Lease and such failure continues for ten (10) days after written notice from [Navient] to [BPG]."[33]  The Lease Agreement expired on February 29, 2020.[34]  On March 3, 2020, Navient provided written notice that BPG was in default of its obligations under the Lease Agreement for failing to reimburse Navient for the unamortized costs of the cooling tower replacement.[35]  BPG denied its obligation to reimburse the cooling tower costs until shortly before trial, when BPG acknowledged it owed Navient that amount.[36]

---

[29] PTO § 2(t).
[30] *Id.*
[31] JX 3 § 6(j)(i)-(ii).
[32] PTO § 2(v); JX 32 at NAV0001526.
[33] JX 3 § 14-A(a).
[34] PTO § 2(x).
[35] *Id.* § 2(y).
[36] *Id.* § 2(u); *see also* JX 3 § 6(j)(i)-(ii).

9

## 2. Transformer

BPG's first claim for costs relates to a transformer Navient replaced during the Lease term. On October 13, 2014, a transformer blew; that transformer was installed at the time the Blue Wing was constructed.[37] Shortly thereafter, Navient personnel contacted Ralph Rossi of BPG via email to notify him of the transformer issue.[38] Mr. Rossi responded and cited Lease Agreement Sections 6(j)(i)-(iii).[39] Based on that contractual language, Mr. Rossi took the position that Navient was responsible for the "repair/replacement [of the transformer] and the capital replacement would be amortized over its useful life," whereupon BPG would reimburse Navient for the unamortized cost at the end of the Lease Agreement term.[40]

The next day, Stephanie Yates from Navient emailed Mr. Rossi with a "strategy proposed by Premium Power Services for setting the transformer in a permanent solution."[41] The Premium Power strategy included replacement of the transformer and adjustments to the concrete pad on which the transformer rested.[42] Mr. Rossi responded that BPG was "OK with this plan" but needed further

---

[37] JX 5; Pl.'s/Countercl. Def.'s Post-Trial Answering Br. at 8 (D.I. 58); Defs.'/Countercl. Pls.' Post-Trial Opening Br. at 10-11.
[38] JX 5.
[39] *Id.*
[40] *Id.* at NAV0002296.
[41] JX 6; *see also* JX 7 (displaying a copy of the Premium Power plan).
[42] JX 6.

10

assurances before signing off on it.[43]  These assurances included: (1) "[c]uts on the transformer being installed"; (2) a letter from a Premium Power engineer that the course of action "is to code and industry standard"; (3) a design by Premium Power relating to the length of the feeders; and (4) a written plan that included when the feeders would be replaced.[44]  Navient's Paul Smith emailed Mr. Rossi and stated Navient addressed all requirements; Mr. Smith asked for permission to proceed.[45] There was further clarification that the concrete pad would need to be leveled at some point.[46]  BPG's general counsel advised Mr. Rossi that BPG would be required to provide a report to BPG's lender that detailed the work performed and ensured the work complied with the Lease Agreement, namely that the work was undertaken in a "Class A manner."[47]  Mr. Rossi notified Navient of BPG's general counsel's concerns and also told Navient that if the report showed additional recommendations to bring the work to such a standard, Navient would be obligated to implement those recommendations under the Lease Agreement's terms.[48]  Mr. Rossi then told Navient it was approved to move forward with the work.[49]

---

[43] *Id.*
[44] *Id.*
[45] JX 8.
[46] JX 12.
[47] JX 8.
[48] *Id.*
[49] *Id.*

Later in the day on October 14, 2014, the blown transformer was replaced.[50] The concrete pad on which the replacement transformer rested was fitted with metal shims in an attempt to level the transformer in compliance with applicable code and the transformer manufacturer's installation instructions.[51] The replacement transformer had a larger capacity than the original but had a two-position switching arrangement as opposed to the original four-position switch.[52] On October 14, 2014, Premium Power's Jeff Donnelly emailed Mr. Rossi and stated the "transformer needs to be level and sealed in order to operate properly. [Premium Power recommends] leveling the transformer at a later date under normal circumstances."[53] On October 24, 2014, Premium Power issued an updated report. The original report stated the transformer replacement was intended to be a "temporary" transformer, but the updated report stated the replacement was intended to be a "replacement" transformer.[54]

Navient paid $70,000 for the replacement transformer.[55] The parties disputed whether Navient or BPG was ultimately responsible for the cost of the replacement transformer.[56] Those discussions continued for three years, until October 13, 2017,

---

[50] JX 12.
[51] Trial Tr. II at 237-39 (Alderson).
[52] *Id.* at 244 (Alderson).
[53] JX 12.
[54] JX 7; JX 9.
[55] PTO § 2(j).
[56] *Id.* § 2(k).

when Chris Buccini from BPG sent an email to Joseph Muffler from Navient and stated "[a]s per our discussion on the phone, [BPG] will credit [Navient] $35k of rent . . . towards reimbursement of the approx[imately] $70k transformer that [Navient] replaced at [the Blue Wing] a few years ago."[57] Mr. Muffler accepted that offer via email.[58] Nevertheless, BPG claims it is entitled to $140,000 because Navient did not meet its contractual obligation to install a four-position switch and a permanent level concrete pad under the transformer.

### 3. Heat Pumps

The second group of items at issue in BPG's counterclaim was the heat pumps for the Blue Wing. After the Lease Agreement ended, BPG employed Edward Levering and Keith Nelson, both from Air Management and Design LLC, to survey approximately 123 heat pumps at the Blue Wing.[59] Messrs. Levering and Nelson were expert witnesses for BPG at trial.[60] On June 18, 2020, after this case was filed, Mr. Levering submitted his first heat pump evaluation; the evaluation recommended that "all the systems that have passed their useful life . . . should be replaced."[61] Mr. Levering based this "useful life" analysis on a handbook published by the American Society of Heating, Refrigerating and Air-Conditioning Engineers ("ASHRAE"),

---

[57] JX 24.
[58] *Id.*
[59] Pl.'s/Countercl. Def.'s Post-Trial Answering Br. at 12; Defs.'/Countercl. Pls.' Post-Trial Opening Br. at 23.
[60] PTO § 6.
[61] JX 39.

which contains a median life expectancy chart for building components at issue in BPG's counterclaim. The median life expectancy for "commercial water-to-air" heat pumps is 19 years.[62] On March 18, 2021, Mr. Levering submitted a more detailed evaluation of the heat pumps.[63] This evaluation provided an itemized list of, *inter alia*, each heat pump, the repair cost, the replacement cost, and each pump's date of manufacture.[64] Again, Mr. Levering recommended that any heat pump that exceeded the 19-year median useful life should be replaced.[65] Mr. Levering's calculation for the total cost of replacement was $405,800.[66]

Mr. Levering identified 25 of 123 heat pump units as non-operational at the time of his evaluation.[67] Mr. Levering stated 11 of the 25 non-operational heat pump units were below their median life expectancy, and these 11 heat pumps should be repaired (rather than replaced) at an estimated cost of $28,750.[68] Mr. Levering stated 14 of the 25 non-operational heat pumps exceeded their median life expectancy and should be replaced at a cost of $107,100.[69] Additionally, Mr. Levering identified 38 heat pumps that—although operational—exceeded their median life expectancy, and

---

[62] JX 49 at 12.
[63] JX 48.
[64] *Id.*
[65] *Id.*
[66] *Id.*
[67] Trial Tr. I at 48-49 (Levering).
[68] JX 48.
[69] *See id.* It appears the repair cost for these 14 units would be $42,500. *See id.*

he proposed replacing these units based solely on the fact they all were more than 19 years old.[70] The cost to replace these 38 units would be $298,600.[71]

Scott Frenck, an engineer and expert witness for BPG, testified he recommended replacing, rather than repairing, any heat pump units that exceed the ASHRAE median life expectancy.[72] Mr. Frenck's expert report and testimony were grounded in Mr. Levering's findings.[73]

Navient called its own expert, Howard Alderson, an engineer who testified there was no reason to replace a heat pump based solely on its age.[74] Mr. Alderson testified the heat pumps at the Blue Wing as of 2021 were well maintained.[75] Navient also called Joe Testerman; Mr. Testerman worked at the Blue Wing as a Raven Services[76] employee from January 2012 until the end of 2017, and Mr. Testerman then performed the same work as an independent contractor for Navient from January 2018 through the end of 2019.[77] Mr. Testerman performed "repairable

---

[70] *See id.*
[71] *See id.*
[72] Trial Tr. I at 103-04 (Frenck).
[73] *Id.*
[74] Trial Tr. II at 252 (Alderson).
[75] *Id.* at 246-47 (Alderson). Mr. Alderson's expert report opined the standard of care for the heat pump units was met by Navient. JX 65 at 13.
[76] Raven Services ("Raven") was a third-party maintenance and engineering company hired by Navient to maintain the Blue Wing. Trial Tr. II at 57-58 (Muffler); *Id.* at 136-38 (Outen). Raven performed systematic and regular maintenance on the HVAC systems, the cooling tower, and related components. Trial Tr. II at 57-58 (Muffler); *Id.* at 136-38 (Outen). Navient entered into service contracts with Raven and paid Raven approximately $250,000 for services through the end of 2017. JX 32 at NAV0001610-36.
[77] Trial Tr. II at 145-47 (Outen); *Id.* at 187-88, 202-05 (Testerman).

maintenance" at the Blue Wing.[78]  Mr. Testerman testified that when he left the Blue Wing in 2019, all HVAC systems were operating.[79]

Additionally, Navient called Clay Outen as a witness.  Mr. Outen has been a director of facility operations for Navient in Delaware since 2015.[80]  Mr. Outen testified Raven was responsible for facility maintenance at the Blue Wing.[81]  Mr. Outen confirmed Raven inspected and replaced heat pump units.[82]  Mr. Outen testified 18 to 20 heat pump units were replaced during the time he was responsible for the Blue Wing.[83]  Mr. Outen also testified four or five new heat pump units were left at the Blue Wing as extra stock when the Lease Agreement expired.[84]

### 4. Rooftop Air Units

BPG's counterclaim also included costs related to rooftop air units.  The Blue Wing has two "Dectron rooftop makeup air units."[85]  These rooftop air units provide makeup air for the Blue Wing, but BPG's inspection showed the units were not operational when Navient left the Blue Wing because the controls never were programmed for the new controllers installed on the rooftop air units.[86]  The rooftop

---

[78] *Id.* at 189 (Testerman).
[79] *Id.* at 221-22 (Testerman).
[80] *Id.* at 131-33 (Outen).
[81] *Id.* at 136 (Outen).
[82] *Id.* at 137 (Outen).
[83] *Id.* at 142 (Outen).
[84] *Id.* at 143 (Outen).
[85] Trial Tr. I at 63 (Nelson).
[86] *Id.* at 75 (Nelson).

16

air units were installed around 2000.[87]  The ASHRAE median life expectancy of rooftop air units is 15 years.[88]

Mr. Frenck, BPG's witness, testified the rooftop air units should have been replaced based solely on the fact the units exceeded their median life expectancy.[89] Mr. Frenck, however, conceded these rooftop air units could be repaired rather than replaced.[90]  Mr. Frenck's expert report indicated these rooftop air units were "in average condition with some repairs needed."[91]  Mr. Levering and Mr. Nelson also testified these rooftop air units could be repaired rather than replaced.[92] Mr. Frenck's estimated cost to repair both rooftop air units totaled $8,400,[93] while BPG's estimated cost to replace the rooftop air units is between $217,200 and $240,000.[94]

### 5. Elevators

Finally, BPG counterclaimed for costs associated with the Blue Wing elevators.  Exhibit H to the Lease Agreement confirms the Blue Wing's second floor corridor, "together with the stairwell and elevator at the end of such corridor providing service to the garage facility . . . is considered part of the Premises for the

---

[87] *Id.* at 117 (Frenck); JX 49 at 6.
[88] JX 49 at App. A.
[89] Trial Tr. I at 115-16 (Frenck).
[90] *Id.*
[91] JX 49 at 6.
[92] Trial Tr. I at 41 (Levering); *Id.* at 95 (Nelson).
[93] JX 49 at App. B.
[94] JX 43; JX 48.

17

purposes of this Lease [Agreement]."[95] The elevator systems at the Blue Wing were manufactured and installed in 1990.[96]

Mark DeCocinis, a senior associate at VDA Elevator and Escalator Consulting and expert witness for BPG, prepared an expert report after the elevators at the Blue Wing were surveyed in March 2021.[97] Mr. DeCocinis testified, consistent with his report, that the elevators should be modernized within three years of the date of his report.[98] In other words, Mr. DeCocinis recommended the elevators undergo modernization by March 2024.[99] Mr. DeCocinis did not recommend upgrades in 2021 because, in his view, piecemeal upgrades were not an optimal plan for elevators.[100] Mr. DeCocinis found the "operating performance" of the existing elevators to be "fair," and he further stated "some adjustments and improvements [were] required."[101]

Navient contracted with ThyssenKrupp Elevator Corporation to maintain the elevators at the Blue Wing during the lease.[102] Under the contract between Navient and ThyssenKrupp in existence when the Lease Agreement expired, ThyssenKrupp performed "regular preventative maintenance, full coverage of parts and repair and

---

[95] JX 3, Ex. H § 15(a).
[96] JX 50.
[97] *See id.*
[98] Trial Tr. II at 43 (DeCocinis).
[99] *Id.*
[100] *Id.* at 43-44 (DeCocinis).
[101] JX 50; Trial Tr. II at 41-43 (DeCocinis).
[102] JX 32 at NAV0001665; Trial Tr. II at 59 (Muffler).

replacement . . . , [and] quality assurance."[103]  Jeff Wilmington of Navient testified Navient paid ThyssenKrupp for its services through the end of the Lease.[104]  Mr. Wilmington testified Navient received the last certificate of compliance for the elevators in June 2019; that certificate was valid for one year.[105]

Between June 9 and 10, 2015, ThyssenKrupp submitted three work orders to Navient related to controller boards, door edges, and a solid state starter.[106]  BPG complains there is no proof Navient paid for any of these three work orders.[107]  None of those items, however, forms the basis of BPG's counterclaim relating to the elevators.  Instead, BPG alleges that in September 2020 it had to repair a bracket in one elevator for $3,345.[108]

### E. Litigation

Navient sued BPG in April 2020.[109]  Navient's sole cause of action alleged BPG breached the Lease Agreement by failing to reimburse Navient for the unamortized cost of replacing the cooling tower.[110]  Navient sought $503,822.72,

---

[103] Trial Tr. II at 101 (Wilmington).
[104] *Id.* at 102 (Wilmington).
[105] *Id.* at 102-03 (Wilmington).
[106] JX 32 at NAV0001671-76.
[107] Defs.'/Countercl. Pls.' Post-Trial Opening Br. at 58.  Navient disputes this allegation and directs the Court to JX 62.  Navient argues JX 62 establishes the "proposal for the control boards was accepted and paid by Navient."  Pl.'s/Countercl. Def.'s Post-Trial Answering Br. at 21; *see also* JX 62.
[108] Defs.'/Countercl. Pls.' Post-Trial Opening Br. at 58; JX 46 (displaying copy for elevator repair service proposal with a payment of $3,345).
[109] D.I. 1.
[110] *See* Compl. ¶ 21.

which the parties agree was the unamortized cost of the tower when the Lease expired.[111] BPG answered and asserted a counterclaim and affirmative defenses.[112] BPG's counterclaim alleged Navient breached the Lease Agreement by failing to: (1) maintain, repair, and/or replace heat pump units; (2) maintain, repair, and/or replace the rooftop air units; (3) properly replace the blown transformer and install a permanent pad to level the transformer; and (4) maintain and repair the elevators.[113] BPG requested $817,845 from Navient.[114] Navient asserted affirmative defenses to the counterclaim.[115]

Before trial, BPG agreed Navient is owed $503,822.72 for the replacement of the cooling tower.[116] BPG continued, however, to maintain its counterclaim.[117]

## F. Procedural History and Parties' Contentions

The Court held a three-day bench trial that began on May 9, 2022.[118] The trial was limited in scope to BPG's counterclaim. After trial, the parties filed post-trial briefs addressing the merits of BPG's counterclaim.[119] The Court held post-trial oral

---

[111] *See id.* Navient also requested attorneys' fees, expenses, collection costs, pre- and post-judgment interest, and Court costs. *Id.*

[112] Answer & Countercl. (D.I. 6).

[113] *Id.*

[114] *Id.*; Defs.'/Countercl. Pls.' Post-Trial Opening Br. at 61. BPG also requests pre- and post-judgment interest, attorneys' fees, and other costs. *See* Defs.'/Countercl. Pls.' Post-Trial Opening Br. at 61.

[115] Answer to Countercl. (D.I. 8).

[116] PTO § 2(z).

[117] *Id.*

[118] *See* Trial Trs. (D.I. 53-55).

[119] *See* D.I. 57-60.

20

argument on February 10, 2023.[120]  This Post-Trial Memorandum Opinion addresses BPG's counterclaim, which is the only remaining substantive issue in the case.

### 1. BPG's Contentions

The parties' post-trial briefs set forth their arguments regarding BPG's breach of contract counterclaim.  BPG contends the Court should enter judgment in its favor in the amount of $817,845, itemized as: (1) $434,500 for heat pumps, (2) $240,000 for rooftop air units, (3) $140,000 for the transformer and pad, and (4) $3,345 for the elevators.[121]  BPG also contends it is entitled to pre- and post-judgment interest, attorneys' fees, and other costs.[122]

BPG contends the evidence at trial demonstrated Navient breached the Lease Agreement in four ways.  First, BPG maintains Navient breached the Lease Agreement by failing to maintain, repair, and/or replace heat pumps at the Blue Wing.[123]  Specifically, BPG asserts the evidence demonstrated BPG is entitled to: (1) $28,750 to repair 11 non-operational heat pumps that had not exceeded their median life expectancy; (2) $107,100 to replace 14 non-operational heat pumps that exceeded their median life expectancy; and (3) $298,600 to replace 38 heat pumps that were operational but exceeded their median life expectancy.[124]  Second, BPG

---

[120] D.I. 62.
[121] Defs.'/Countercl. Pls.' Post-Trial Opening Br. at 61.
[122] *Id.*
[123] *See id.* at 32.
[124] *Id.*

maintains Navient breached the Lease Agreement by failing to maintain, repair, and/or replace two rooftop air units.[125] Specifically, BPG asserts it is entitled to $240,000 to repair or replace the rooftop air units because Navient did not properly maintain and modernize them during the Lease period.[126] Third, BPG contends Navient breached the Lease Agreement by replacing the Blue Wing's transformer with a "2-position switch rather than a 4-position switch" and by installing "makeshift metal to keep the [transformer] unit level on the [supporting] pad."[127] BPG asserts it is entitled to $140,000 because Navient installed an improper transformer.[128] Fourth, BPG contends Navient breached the Lease Agreement by failing to maintain and repair the elevators at the Blue Wing.[129] BPG asserts it is entitled to $3,345 because BPG had to repair a bracket associated with an elevator that was Navient's responsibility under the Lease Agreement.[130]

BPG additionally contends it is entitled to fee shifting because it is the "successful party" in this action and therefore is entitled to reimbursement of its legal fees and expenses under Lease Agreement Section 28(q).[131]

---

[125] *Id.* at 44.
[126] *Id.* at 45-47.
[127] *Id.* at 49.
[128] *Id.* at 56, 61.
[129] *Id.* at 57.
[130] *Id.* at 58.
[131] *Id.* at 59-60. BPG also argues Navient is not entitled to recoupment under the Lease Agreement if BPG is successful on its counterclaim, which Navient sets forward as an affirmative defense. *See* Defs.'/Countercl. Pls.' Post-Trial Reply Br. at 24 (D.I. 59).

## 2. Navient's Contentions

It is now undisputed that Navient is entitled to $503,822.72 for the unamortized cost incurred when it replaced the cooling tower at the Blue Wing.[132] What remains in dispute is whether that amount should be set-off, in whole or in part, by BPG's counterclaim. Navient contends BPG did not prove either liability or damages with respect to its counterclaim. First, Navient maintains BPG failed to establish Navient breached the Lease Agreement with respect to the heat pumps.[133] Specifically, Navient contends the evidence at trial demonstrated Navient fulfilled all maintenance and repair obligations with respect to the heat pumps.[134] Navient further argues Mr. Alderson's testimony established there was no way to show Navient caused the deficiencies in the non-operational heat pumps.[135] And Navient maintains Mr. Levering's testimony regarding replacing heat pumps when they exceeded their median life expectancy was disputed by Mr. Frenck's testimony to the contrary.[136] Second, Navient asserts BPG failed to establish Navient breached the Lease Agreement with respect to the rooftop air units because BPG's claim was premised entirely on its contention that the units required replacement once they

---

[132] Pl.'s/Countercl. Def.'s Post-Trial Answering Br. at 34. Navient inadvertently refers to the sum as $503,922.72, but it is clear from Navient's briefing that it seeks $503,822.72. *See, e.g.*, *id.* at 1, 3, 33 (noting Navient seeks the sum demanded in the Complaint, which is $503,822.72).
[133] *Id.* at 26.
[134] *Id.* at 27, 29.
[135] *Id.* at 28.
[136] *Id.* at 29.

passed their median life expectancy, even though BPG's experts admitted the units could be repaired, rather than replaced.[137]

Third, Navient contends BPG did not prove Navient breached the Lease Agreement with respect to the transformer. Navient claims the evidence shows: BPG was notified immediately when the transformer blew; BPG was involved in the process and strategy to find a replacement transformer; BPG approved Premium Power's plan to install a replacement, which included construction of fabricated metal shims to level the transformer; and BPG offered no evidence that the transformer is not operating properly.[138] Navient alternatively argues BPG's counterclaim relating to the transformer is barred by Delaware's three-year statute of limitations because BPG knew about the replacement transformer in October 2014.[139] Fourth, Navient contends BPG offered no evidence that any defect relating to the bracket in the elevator occurred during Navient's occupancy or that Navient's alleged lack of maintenance caused the need to repair that bracket.[140]

Navient additionally argues that if BPG is successful on its counterclaim, "Navient shall receive a reimbursement of those costs from BPG as the landlord calculated as 'then remaining unamortized cost' of the replacement item."[141] Like

---

[137] *Id.* at 29-30.
[138] *Id.* at 24-25.
[139] *Id.* at 26.
[140] *Id.* at 30.
[141] Pl.'s/Countercl. Def.'s Post-Trial Sur-Reply Br. at 3 (D.I. 60); *see also* Pl.'s/Countercl. Def.'s Post-Trial Answering Br. at 31-32.

BPG, Navient also contends it is entitled to fee shifting under the Lease Agreement. Navient argues it is the successful party in this action because: (1) it was successful on its claim relating to the unamortized cost for the cooling tower replacement, and (2) BPG is unsuccessful on its counterclaim.[142] Navient further contends that even if BPG partially succeeds on its counterclaim, Navient remains the successful party because it "prevailed on the predominance of all of the issues."[143]

## II. ANALYSIS

With those factual findings and the parties' contentions in mind, the Court turns to resolving the ultimate claims in this case. Each party bears the burden of proving their respective claims and defenses by a preponderance of the evidence.[144]

### A. Navient prevails on its claim to recover the unamortized costs of the cooling tower.

Navient initiated this action and brought a claim for breach of the Lease Agreement.[145] Specifically, Navient replaced the cooling tower and its component parts between April and May 2019.[146] When the Lease expired, the remaining unamortized cost of replacing the cooling tower and its component parts was

---

[142] Pl.'s/Countercl. Def.'s Post-Trial Answering Br. at 32-33.
[143] *Id.* at 33.
[144] *See, e.g.*, *Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967) (defining the preponderance of the evidence standard); *see also Oberly v. Howard Hughes Med. Inst.*, 472 A.2d 366, 390 (Del. Ch. 1984), *abrogated on other grounds*, *Staats by Staats v. Lawrence*, 576 A.2d 663, 666-67 (Del. Super. 1990).
[145] Compl. ¶¶ 10-19.
[146] PTO § 2(t).

$503,822.72.[147] Pursuant to Sections 6(j)(i)-(ii) of the Lease Agreement, BPG agreed to reimburse Navient for replacing "Building Systems," which included the cooling tower.[148] The Lease Agreement specified the cost of the replacement "shall be amortized over the useful life thereof at a rate of eight (8%) per annum and [Navient] shall receive an amount from [BPG] at the expiration or sooner termination of the Lease equal to the then-remaining unamortized cost of such Replacement Item [*i.e.*, the cooling tower]."[149]

On January 28, 2020, Navient notified BPG of Navient's request for the amount of $503,822.72 for the then-unamortized cost of the cooling tower replacement.[150] The Lease Agreement states BPG "shall be deemed to be in default of this Lease if [BPG] fails to make any payments to [Navient] required under this Lease and such failure continues for ten (10) days after written notice from [Navient] to [BPG]."[151] The Lease Agreement expired on February 29, 2020.[152] On March 3, 2020, Navient provided written notice to BPG that it was in default of its obligations under the Lease Agreement for failing to reimburse Navient for the unamortized cost

---

[147] *Id.*
[148] *Id.* § 2(u); *see also* JX 3 § 6(j)(i)-(ii).
[149] JX 3 § 6(j)(i)-(ii).
[150] PTO § 2(v); JX 32 at NAV0001526.
[151] JX 3 § 14-A(a).
[152] PTO § 2(x).

of the cooling tower replacement.[153]  BPG concedes Navient is owed $503,822.72 for the replacement of the cooling tower and its component parts.[154]

Navient therefore is entitled to judgment in its favor on its claim for the unamortized cost for the cooling tower replacement plus prejudgment interest, accruing as of March 17, 2020, which is ten business days after Navient sent BPG notice of default.[155]

## B. BPG's claim relating to the transformer is barred by the statute of limitations.

The original transformer at the Blue Wing blew in October 2014.[156]  On October 14, 2014, after discussions and approval by BPG, Navient replaced the transformer and fitted the concrete pad on which the transformer rests with metal shims in an attempt to level the transformer.[157]  The replacement transformer was originally marked as a "temporary" transformer, but the contractor, Premium Power, later issued an updated report stating the transformer was a "replacement"

---

[153] *Id.* § 2(y).
[154] *Id.* § 2(z).
[155] *See Delta Eta Corp. v. Univ. of Delaware*, 2010 WL 2949632, at *2 (Del. July 29, 2010) ("'The general rule [in a breach of contract action] is that interest starts on the date when payment should have been made.'" (quoting *Metro. Mut. Fire Ins. Co. v. Carmen Hldg. Co.*, 220 A.2d 778, 782 (Del. 1966)); *Balooshi v. GVP Global Corp.*, 2022 WL 576819, at *14 (Del. Super. Feb. 25, 2022) ("In contract actions, pre-judgment interest is computed from the date of the breach." (citing *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992)).
[156] JX 5; Pl.'s/Countercl. Def.'s Post-Trial Answering Br. at 8; Defs.'/Countercl. Pls.' Post-Trial Opening Br. at 10-11.
[157] JX 12; Trial Tr. II at 237-40 (Alderson).

transformer.[158] Navient paid $70,000 for the replacement transformer, but later received rent credit for half that amount.[159]

BPG contends Navient breached the Lease Agreement by installing a 2-position switch transformer (as opposed to the existing 4-position or multiple 2-position) and by installing a makeshift metal support (as opposed to a permanent level concrete pad).[160] BPG claims it suffered $140,000 in damages as a result of Navient's transformer replacement.[161] Navient responds that BPG failed to establish by a preponderance of the evidence that Navient breached the Lease Agreement with respect to the transformer.[162] Navient alternatively argues that BPG's counterclaim relating to the transformer is barred by Delaware's three-year statute of limitations because BPG knew about the replacement transformer in October 2014.[163]

There is a three-year statute of limitations for breach of contract claims in Delaware.[164] Generally, a breach of contract claim must be brought within three years "from the date that the cause of action accrued."[165] Breach of contract claims

---

[158] JX 7; JX 9.
[159] PTO § 2(j).
[160] Defs.'/Countercl. Pls.' Post-Trial Opening Br. at 56.
[161] *Id.* at 61.
[162] Pl.'s/Countercl. Def.'s Post-Trial Answering Br. at 24-25.
[163] *Id.* at 26.
[164] 10 *Del. C.* § 8106 (2023).
[165] *Levy v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 768 (Del. 2013) (citation omitted).

accrue "as soon as the breach occurs, even if the aggrieved plaintiff is ignorant of the breach."[166]

Even assuming a breach occurred, BPG's claim for the transformer is barred by Delaware's three-year statute of limitations. The record reflects BPG was aware of Navient's detailed plans to replace the transformer and level its concrete pad no later than October 14, 2014.[167] BPG received Premium Power's plan for replacement, and BPG stated Navient was "approved to move forward with [its] work."[168] Accordingly, BPG was required to bring this claim no later than October 14, 2017.[169] BPG did not assert this claim until June 26, 2020, when it filed its Answer and Counterclaim.[170] BPG's claim relating to the transformer therefore is time-barred.

---

[166] *Intermec IP Corp. v. TransCore, LP*, 2021 WL 3620435, at *21 (Del. Super. Aug. 16, 2021) (citing *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004)).

[167] *See* JX 5 (s email chain between Navient and BPG on October 13, 2014, explaining that the transformer at the Blue Wing needed to be replaced); JX 6 (email chain between Navient and BPG discussing Premium Power's plan to replace the transformer); JX 8 (October 14, 2014 email from Mr. Rossi of BPG to Navient stating Navient was "approved to move forward with their work").

[168] JX 6; JX 8.

[169] *See* 10 *Del. C.* § 8106 ("[N]o action based on a promise . . . shall be brought after the expiration of 3 years from the accruing of the cause of such action."); *Cont'l Fin. Co., LLC v. ICS Corp.*, 2020 WL 836608, at *4 (Del. Super. Feb. 20, 2020) ("Generally, the statute of limitations 'begins to run when a plaintiff's claim accrues[,] which occurs at the moment of the wrongful act and not when the effects of the act are felt even if the plaintiff is ignorant of the cause of action.'" (alteration in original) (quoting *Silverstein v. Fischer*, 2016 WL 3020858, at *4 (Del. Super. May 18, 2016)).

[170] *See* Answer & Countercl.

29

BPG argues its claim for the transformer did not accrue until the Lease term ended.[171] BPG, however, offers neither textual nor caselaw support for this argument. BPG's cause of action accrued at the time the transformer blew, or at least when the Premium Power plan was implemented,[172] both of which occurred more than five years before BPG filed its counterclaim.

### C. BPG is entitled to the repair costs for the 25 non-operational heat pumps.

After the Lease ended, BPG employed Messrs. Levering and Nelson to survey the approximately 123 heat pumps in the Blue Wing.[173] Mr. Levering identified 25 heat pumps that were non-operational.[174] Of those 25, 11 pumps were below median life expectancy, and Mr. Levering testified they could be repaired at an estimated total cost of $28,750.[175] Fourteen of the 25 non-operational heat pumps exceeded their median life expectancy, and Mr. Levering opined they should be replaced at an estimated cost of $107,100.[176]

BPG contends Navient breached the Lease Agreement by failing to maintain, repair, and/or replace heat pumps at the Blue Wing. BPG asserts the evidence

---

[171] *See* Defs.'/Countercl. Pls.' Post-Trial Reply Br. at 20-21.

[172] *See Intermec IP Corp.*, 2021 WL 3620435, at *21 ("[T]he statute [of limitations in a contract action] is triggered as soon as the breach occurs, even if the aggrieved [party] is ignorant of the breach." (citing *Wal-Mart Stores, Inc.*, 860 A.2d at 319).

[173] Pl.'s/Countercl. Def.'s Post-Trial Answering Br. at 12; Defs.'/Countercl. Pls.' Post-Trial Opening Br. at 23.

[174] Trial. Tr. I at 48-49 (Levering).

[175] JX 48.

[176] *Id.* It appears the repair cost for these 14 units would be $42,500. *See id.*

30

demonstrated BPG is entitled to: (1) $28,750 to repair 11 non-operational heat pumps that had not exceeded their median life expectancy; (2) $107,100 to replace 14 non-operational heat pumps that had exceeded their median life expectancy; and (3) $298,600 to replace 38 heat pumps that were operational but had exceeded their median life expectancy.[177] Navient counters that BPG failed to establish Navient breached the Lease Agreement with respect to the heat pumps. Navient contends the evidence shows Navient maintained and repaired the heat pumps in accordance with the terms of the Lease Agreement.[178] Navient argues BPG did not show Navient caused any deficiencies in the heat pumps such that Navient is responsible for any costs associated with the units.[179]

To prove Navient breached the Lease Agreement with respect to the heat pumps, BPG must demonstrate (1) the existence of a valid contract, (2) breach of an obligation imposed by that contract, and (3) resulting damages.[180] The parties do not dispute the Lease Agreement is a valid contract. Section 6(j)(i) established Navient's obligations with respect to "Building Systems exclusively serving the Building."[181] Navient admits the heat pumps fall within the language of Section

---

[177] Defs.'/Countercl. Pls.' Post-Trial Opening Br. at 32.
[178] Pl.'s/Countercl. Def.'s Post-Trial Answering Br. at 27.
[179] *Id.* at 28.
[180] *McCoy v. Cox*, 2007 WL 1677536, at *1 (Del. Super. June 11, 2007) (citing *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).
[181] JX 3 § 6(j)(i).

6(j)(i).[182] Section 6(j)(i) required Navient, at its "sole cost and expense, to maintain, repair and replace all Building Systems exclusively serving the Building in good order and repair."[183]

The Court here focuses on the 25 heat pumps that Mr. Levering found to be non-operational. Of those, Mr. Levering opined the 11 that were within their life expectancy could be repaired for $28,750.[184] Mr. Levering also found 14 of the 25 non-operational heat pumps exceeded their median life expectancy and should be replaced for $107,100.[185] Mr. Levering testified these 14 heat pumps could be repaired for $42,500, but Mr. Levering stated repairing these 14 heat pumps could be difficult because the units are "obsolete [and] parts are hard to get."[186]

Navient asserts it is not responsible for any repair or replacement costs because Mr. Alderson testified there was no way to establish whether any of the repairs were the consequence of issues that arose when Navient was the tenant.[187] This argument is not persuasive. Mr. Levering initially reported on the heat pumps on June 18, 2020,[188] approximately three-and-a-half months after the Lease ended. Mr. Levering's invoices to BPG indicate he surveyed the heat pumps during

---

[182] Pl.'s/Countercl. Def.'s Post-Trial Answering Br. at 31-32.
[183] JX 3 § 6(j)(i).
[184] JX 48; Trial Tr. I at 47 (Levering).
[185] JX 48; Trial Tr. I at 19 (Levering).
[186] Trial Tr. I at 19-20 (Levering).
[187] Pl.'s/Countercl. Def.'s Post-Trial Answering Br. at 28.
[188] JX 39.

February and March 2020.[189] To the extent Navient argues the need for repairs occurred after the Lease ended, the evidence shows otherwise. Further, the Lease Agreement required Navient to "maintain, repair and replace" any heat pumps that required maintenance,[190] and Navient accepted the Blue Wing "in 'as-is' condition and configuration without any representations or warranties by" BPG.[191] The Lease therefore required Navient to "maintain, repair and replace" any heat pumps that needed maintenance regardless of whether the need arose before the Lease started. Accordingly, Navient breached the Lease with respect to the non-operational heat pumps.

BPG therefore is entitled to the cost of repair for the 11 non-operational units that had not exceeded their median life expectancy. Additionally, with respect to the 14 non-operational heat pumps that exceeded their life expectancy, BPG is entitled to the cost to repair those 14 units. BPG did not establish the 14 heat pumps need to be replaced rather than repaired. To the contrary, nothing in the language of the Lease Agreement required Navient to replace, rather than repair, systems based on their median life expectancy. Rather, the Lease referred broadly to Navient's obligation to "maintain, repair and replace all Building Systems exclusively serving

---

[189] *See* JX 40.
[190] JX 3 § 6(j)(i).
[191] *Id.* § 4.

33

the Building *in good order and repair*."[192]  This language gave Navient discretion to determine whether a system should be repaired or replaced, limited only by the requirement that the systems remain in "good order and repair."  If BPG wanted to impose a particular industry standard on Navient's obligation to keep systems "in good order and repair," it could have drafted language to that effect.  A reasonable tenant would elect to repair the 14 units for a cost close to one-third (1/3) the replacement cost.

For the same reason, BPG failed to establish Navient breached the Lease with respect to the 38 heat pumps that were operational but beyond their median life expectancy.[193]  Mr. Levering recommended replacing these 38 heat pumps solely because they exceeded their median life expectancy.[194]  The Court does not find this recommendation persuasive.  Mr. Frenck, BPG's witness, testified that he would not recommend replacing a heat pump solely because it exceeded its median life expectancy.[195]  Mr. Alderson, Navient's witness, provided similar testimony.[196] BPG did not establish heat pumps that exceeded their median life expectancy but otherwise were operational had to be replaced under either the terms of the Lease Agreement or the parties' course of performance.

---

[192] *Id.* § 6(j)(i) (emphasis added).
[193] *See* JX 48; Trial Tr. I at 50 (Levering).
[194] JX 48; Trial Tr. I at 50 (Levering).
[195] Trial Tr. I at 113 (Frenck).
[196] Trial Tr. II at 252 (Alderson).

**D. BPG is entitled to recover the repair costs for the rooftop air units.**

The Blue Wing had two rooftop air units.[197] These units were installed in 2000, and they had an ASHRAE median life expectancy of 15 years.[198] The evidence at trial showed the units were not operational when Navient's Lease ended because the controls never were programmed for new controls installed on those units.[199] It appears from the record that the first evaluation of the rooftop air units occurred on July 15, 2020.[200] Mr. Frenck testified the rooftop air units should be replaced solely because they exceeded their median life expectancy,[201] but he also conceded the units could be repaired instead, as did Mr. Levering and Mr. Nelson.[202] Mr. Frenck estimated the total cost to repair both rooftop air units is $8,400.[203] The estimated cost of replacing both units was between $217,200 and $240,000.[204]

BPG's claim with respect to the rooftop air units requires the Court to determine whether Navient breached the Lease Agreement, and, if so, whether BPG

---

[197] *See* Trial Tr. I at 63 (Nelson).
[198] JX 49; Trial Tr. I at 117 (Frenck).
[199] Trial Tr. I at 75 (Nelson).
[200] *See* JX 43.
[201] Trial Tr. I at 115-16 (Frenck).
[202] *Id.*; *Id.* at 41 (Levering); *Id.* at 95 (Nelson).
[203] JX 49 at App. B (showing the cost to repair one unit is $2,600, and the cost to repair the other unit is $5,800); *see also* Trial Tr. I at 41 (Levering) (noting that Appendix B to JX 49 covers the repair costs for, *inter alia*, the rooftop air units). Mr. Frenck authored the HVAC Building Assessment numbered as JX 49. *See* Trial Tr. I at 102 (Frenck).
[204] JX 43 (noting in Mr. Nelson's report that the cost to replace the two rooftop air units is $217,200); JX 48 (noting in Messrs. Levering and Nelson's report that the replacement cost is "$240,000.00 for both units").

suffered damages.[205] Navient admits the rooftop air units fall within the language of Section 6(j)(i),[206] which required Navient, at its "sole cost and expense, to maintain, repair and replace all Building Systems exclusively serving the Building in good order and repair."[207] Mr. Frenck testified the rooftop units were "in average condition with some repairs needed" at the time of his inspection.[208] Messrs. Nelson and Levering both testified the rooftop air units did not need to be replaced but instead could be repaired.[209] The Court finds Navient breached the Lease Agreement by failing to maintain the rooftop air units in compliance with the standards set forth in Section 6(j)(i). The Court additionally finds BPG did not establish the rooftop air units need to be replaced; rather, the evidence establishes these rooftop air units could be repaired. BPG therefore is entitled to the cost of repair set forth in Mr. Frenck's expert report, which is $8,400.[210]

### E. BPG is not entitled to any repair or replacement costs relating to the Blue Wing elevators.

The Blue Wing's elevator systems are comprised of two passenger elevators and one freight elevator, all of which were installed in 1990.[211] Navient employed

---

[205] *Cox*, 2007 WL 1677536, at *1 (citing *VLIW Tech.*, 840 A.2d at 612).
[206] Pl.'s/Countercl. Def.'s Post-Trial Answering Br. at 31-32.
[207] JX 3 § 6(j)(i).
[208] Trial Tr. I at 118 (Frenck); JX 49 at 6.
[209] Trial Tr. I at 41 (Levering); *Id.* at 95 (Nelson).
[210] JX 49 at App. B.
[211] JX 50.

ThyssenKrupp to maintain the elevators at the Blue Wing.[212] ThyssenKrupp performed regular preventative maintenance.[213] Mr. Wilmington of Navient testified that the last certificate of compliance for the elevators was issued in June 2019, and that certificate was valid for one year.[214] BPG emphasized at trial that ThyssenKrupp submitted three work orders to Navient in June 2015 for controller boards, door edges, and a solid state starter.[215] BPG asserts there is no evidence Navient paid these invoices.[216] But that is not BPG's claim for breach relating to the elevators; rather, BPG asserts that in September 2020 it had to repair a bracket in one elevator for $3,345.[217]

The Lease Agreement required Navient to maintain the elevators at the Blue Wing. The Court therefore must determine whether BPG proved the bracket needed repair at the time the Lease ended. BPG has not established any lack of maintenance by Navient caused the need for the bracket repair. To prevail on its breach of contract claim, BPG had to prove Navient breached the Lease Agreement and the "breach caused the loss."[218] Stated differently, BPG did not prove by a preponderance of the evidence that the need to repair the bracket arose at or before

---

[212] JX 32 at NAV0001665; Trial Tr. II at 59 (Muffler).
[213] Trial Tr. II at 101 (Wilmington).
[214] *Id.* at 102-03 (Wilmington).
[215] Defs.'/Countercl. Pls.' Post-Trial Opening Br. at 57-58.
[216] *Id.* at 58.
[217] *Id.*; JX 46.
[218] *LaPoint v. AmerisourceBergen Corp.*, 2007 WL 1309398, at *7 (Del. Ch. May 1, 2007) (quoting *Tanner v. Exxon Corp.*, 1981 WL 191389, at *2 (Del. Super. July 23, 1981)).

the time the Lease ended. Indeed, the weight of the evidence is to the contrary. Navient employed ThyssenKrupp to conduct "regular preventative maintenance, full coverage of parts and repair and replacement . . . , [and] quality assurance."[219] Mr. Wilmington testified Navient paid ThyssenKrupp for its services through the end of the Lease term.[220] And Mr. Wilmington testified Navient received a certificate of compliance from New Castle County for the Blue Wing elevators in June 2019, which was valid for one year.[221] There is no apparent link between the June 2015 work orders and the September 2020 bracket repair. Further, Mr. DeCocinis's testimony does not change the outcome. Mr. DeCocinis, BPG's expert, testified the elevators should undergo modernization by March 2024, but that the operating performance of the elevators was "fair."[222] Nothing in the Lease Agreement required Navient to modernize or upgrade building systems that were otherwise operational.

BPG therefore has failed to carry its burden to prove it is entitled to $3,345 for the elevator bracket repair.

---

[219] Trial Tr. II at 101 (Wilmington).
[220] *Id.* at 102 (Wilmington). Navient also disputes BPG's allegation that Navient did not pay the June 2015 invoices. *See* Pl.'s/Countercl. Def.'s Answering Br. at 21 (directing the Court to JX 62 and stating Navient paid for the control board issue).
[221] Trial Tr. II at 102-03 (Wilmington).
[222] *Id.* at 41-43 (DeCocinis); JX 50.

## F. Navient's Recoupment Affirmative Defense fails under the Lease Agreement's plain language.

Navient contends that for any portion of BPG's counterclaim on which BPG is successful, Navient is entitled to recoupment of BPG's award under the terms of the Lease Agreement.[223]  Based on the Court's above findings, that means Navient believes it is entitled to recoupment for the repair costs of the heat pumps and rooftop air units.[224]  Navient essentially maintains that even if, as required by the Lease Agreement, Navient paid to repair the non-operational heat pumps and the two rooftop air units, Navient would be entitled to have BPG reimburse (as an Unamortized Reimbursement) Navient for that cost up to $300,000.  As Navient puts it, "[a]ny judgment [for BPG] less than $300,000 would be essentially null."[225]

Section 6(j)(i) states in pertinent part:

In the event all or any portion of the Building Systems exclusively serving the Building requires replacement during the Term, [Navient] shall undertake the same at its sole cost and expense, and such replacement shall be accomplished, in a Class-A manner, using materials and equipment consistent with that found in comparable office buildings in the Wilmington, Delaware metropolitan area. However, notwithstanding the foregoing . . . , if (1) the portion of the Building Systems being replaced (the "Replacement Item") has a useful life extending beyond the Lease Term . . . , and (2) the cost of such Replacement Item would otherwise constitute a capital repair or replacement cost [if] such items were purchased by or on behalf of [BPG], then the cost of such Replacement Item shall be amortized over

---

[223] Pl.'s/Countercl. Def.'s Post-Trial Answering Br. at 31-32.
[224] The Court found BPG is entitled to repair costs on certain heat pumps and the rooftop air units. Navient notes that both the heat pumps and rooftop air units fall within Section 6(j)(i). *See* Pl.'s/Countercl. Def.'s Post-Trial Answering Br. at 31.
[225] *Id.* at 32.

the useful life thereof at a rate of eight percent (8%) per annum, and [Navient] shall receive an amount from [BPG] at the expiration or sooner termination of the Lease equal to the then-remaining unamortized cost of such Replacement Item (the "Unamortized Reimbursement").[226]

Section 6(j)(ii) caps the "Unamortized Reimbursement" at $300,000 for "Building Systems" other than the cooling tower.[227]

Navient raised "setoff and/or recoupment" as its Eighth Affirmative Defense.[228] Navient only argued recoupment in its post-trial briefing.[229] "Setoff and recoupment are related but different defenses."[230] Setoff is a defense "by which the defendant acknowledges the justice of the plaintiff's demand, but sets up a defense of his own against the plaintiff, to counterbalance it either in whole or in part."[231] Recoupment "is a species of defense somewhat analogous to [setoff] . . . but the defense of recoupment goes to the reduction of the plaintiff's damages for the reason that [plaintiff] has not complied with the cross obligations arising under the same contract."[232]

---

[226] JX 3 § 6(j)(i).

[227] *Id.* § 6(j)(ii).

[228] Answer to Countercl. at 4.

[229] *See* Pl.'s/Countercl. Def.'s Post-Trial Answering Br. at 31-32; Pl.'s/Countercl. Def.'s Post-Trial Sur-Reply Br. at 4-5.

[230] *Finger Lakes Cap. P'rs, LLC v. Honeoye Lake Acquisition, LLC*, 151 A.3d 450, 453 (Del. 2016).

[231] *Id.* (internal quotation marks and citation omitted).

[232] *Id.* (internal quotation marks and citation omitted).

The Court finds Navient failed to carry its burden to prove by a preponderance of the evidence that it is entitled to recoupment. First, the relevant Lease terms refer only to Navient's right to be reimbursed for the unamortized cost of a "Replacement Item." The Court has not found that Navient was required to replace any Building System, only that it was required to repair certain systems. Second, even if Section 6(j)(i) applied to repair costs, Navient did not elicit testimony regarding the amount of unamortized costs to which Navient believes it is entitled for the heat pumps and the rooftop air units. In its post-trial briefing, Navient points only to Mr. Alderson's expert report.[233] Mr. Alderson's report contains his opinions as to what BPG owes Navient under the Lease Agreement for various costs regarding the heat pumps and rooftop air units.[234] This evidence is probative of Navient's contention, but it is not enough. The Court does not find Mr. Alderson's report sufficient for Navient to carry its burden regarding the unamortized repair costs. Navient therefore is not entitled to recoupment costs under Section 6(j) of the Lease Agreement.

## G. Navient is entitled to recover its attorneys' fees as the prevailing party.

Section 28(q) of the Lease Agreement states "[i]n the event of any litigation between [BPG] and [Navient], the unsuccessful party as determined by a court of

---

[233] Pl.'s/Countercl. Def.'s Post-Trial Sur-Reply Br. at 5 (citing JX 65). Navient provided more record citations for the transformer, but the transformer is not at issue because BPG's claim on the transformer is barred by the statute of limitations.

[234] *See, e.g.*, JX 65 at 11 (opining on water source heat pumps and makeup air units); *see also id.*, Ex. H (displaying Mr. Alderson's opinions on amortization/depreciation calculations).

competent jurisdiction shall reimburse the successful party for all legal fees and expenses incurred by the successful party in prosecuting or defending any such action."[235] Navient contends it is the successful party in full on its affirmative claim, and even if BPG is partially successful on its counterclaim, Navient still prevails on the majority of the issues.[236] BPG contends that unless Navient achieves a net principal recovery of "1 cent more than 50%" of Navient's affirmative claim, then BPG is the prevailing party.[237]

"Delaware generally follows the American Rule, under which litigants are responsible for their own attorneys' fees, regardless of the outcome of the lawsuit."[238] An exception to the American Rule applies "in contract litigation that involves a fee shifting provision."[239] In those cases, Delaware courts generally enforce a contractual agreement to shift fees.[240] Absent "qualifying language that fees are to be awarded claim-by-claim or on some other partial basis, a contractual provision entitling the prevailing party to fees will usually be applied in an all-or-

---

[235] JX 3 § 28(q).
[236] Pl.'s/Countercl. Def.'s Post-Trial Answering Br. at 33.
[237] Defs.'/Countercl. Pls.' Post-Trial Opening Br. at 60.
[238] *Bako Pathology LP v. Bakotic*, 288 A.3d 252, 280 (Del. 2022) (quoting *Alaska Elec. Pension Fund v. Brown*, 988 A.2d 412, 417 (Del. 2010)).
[239] *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del. 2007); *see also Bako Pathology LP*, 288 A.3d at 280 (citing *Mahani*).
[240] *Bako Pathology LP*, 288 A.3d at 280 (quoting *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 352 (Del. 2013)).

nothing manner."[241] In such an all-or-nothing case, the Court analyzes the "predominance in the litigation" to determine the prevailing party.[242] "To establish predominance, the party must prevail on the case's chief issue[s]."[243]

There were two chief issues in this action: (1) Navient's claim for breach of the Lease Agreement with respect to the cooling tower reimbursement; and (2) BPG's counterclaim for breach of the Lease Agreement with respect to the transformer, heat pumps, rooftop air units, and elevators. As to the first issue, Navient indisputably is the prevailing party. BPG conceded shortly before trial that it owed Navient $503,822.72 for replacement of the cooling tower.[244] With respect to the second issue, the Court also finds Navient is the prevailing party. BPG sought $817,845 from Navient based on: (a) $434,500 for the heat pumps, (b) $240,000 for the rooftop air units, (c) $140,000 for the transformer, and (d) $3,345 for the elevator.[245] The Court has determined BPG is entitled to a total of $79,650: $8,400 to repair the rooftop air units and $71,250 to repair the non-operational heat pumps ($28,750 for the 11 non-operational pumps within their life expectancy, and $42,500

---

[241] *AFH Hldg. & Advisory, LLC v. Emmaus Life Scis., Inc.*, 2014 WL 1760935, at *2 (Del. Super. Apr. 16, 2014) (quoting *West Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2009 WL 458779, at *8 (Del. Ch. Feb. 23, 2009)).

[242] *Duncan v. STTCPL, LLC*, 2020 WL 829374, at *15 (Del. Super. Feb. 19, 2020) (citing *Mrs. Fields Brand, Inc. v. Interbake Foods LLC*, 2018 WL 300454, at *2 (Del. Ch. Jan. 5, 2018)).

[243] *Id.* (citing *2009 Caiola Fam. Tr. v. PWA, LLC*, 2015 WL 6007596, at *33 (Del. Ch. Oct. 14, 2015)); *see also id.* (noting that there can be more than one chief issue in a case).

[244] PTO § 2(z).

[245] Defs.'/Countercl. Pls.' Post-Trial Opening Br. at 61.

for the 14 non-operational pumps past their life expectancy). The Court therefore finds Navient prevailed on BPG's counterclaim because it successfully defended more than 90% of the damages BPG sought.

The Court recognizes there are circumstances "where 'no party may be regarded as having prevailed.'"[246] For example, in *Vianix Delaware LLC v. Nuance Communications, Inc.*,[247] the Court of Chancery held "there was no prevailing party and decline[d] both parties' requests for attorneys' fees and costs" where each side won "on several claims and contentions" and one party recovered "what may be millions of dollars in damages, but far less than it claimed."[248] But that is not the case here. Instead, Navient recovered more than what this Court has found sufficient to be the "prevailing party."[249] The Court therefore finds BPG is the "unsuccessful party" under Section 28(q) of the Lease Agreement, and Navient is the successful party entitled to "all legal fees and expenses incurred . . . in prosecuting [and] defending" this action.[250]

---

[246] *Duncan*, 2020 WL 829374, at *15 (quoting *Vianix Delaware LLC v. Nuance Commc'ns, Inc.*, 2010 WL 3221898, at *28 (Del. Ch. Aug. 13, 2010)).

[247] 2010 WL 3221898, at *28 (Del. Ch. Aug. 13, 2010).

[248] *Id.* at *29.

[249] *See, e.g.*, *AFH Hldg. & Advisory, LLC*, 2014 WL 1760935, at *2-3 (finding one party was the prevailing party where that party was successful on the core breach of contract claim, and additionally finding that even though that party voluntarily dismissed fraud claims, it was still the prevailing party under the "all-or-nothing" approach).

[250] JX 3 § 28(q).

**CONCLUSION**

For the reasons explained above, Navient is entitled to judgment in the amount of $503,822.72, plus costs, interest, and attorneys' fees, less $79,650 for the repair costs of the 25 non-operational heat pumps and the repair costs of the two rooftop air units. Navient is entitled to pre-judgment interest on the net principal amount, with interest accruing as of March 17, 2020. BPG has proved its counterclaim by a preponderance of the evidence with respect to repairing (not replacing) the 25 non-operational heat pumps and the two rooftop air units, and the Court therefore enters judgment in BPG's favor as to these portions of the counterclaim. BPG has not proved its counterclaim by a preponderance of the evidence with respect to the transformer and the elevator, and the Court therefore enters judgment in Navient's favor as to these portions of the counterclaim. If there are any open issues not addressed by this post-trial opinion, the parties shall notify the Court by letter within five calendar days. Otherwise, Navient shall prepare a conforming form of order and file it with the Court within ten calendar days. If BPG objects to the form of order, it shall so advise the Court by letter within two days of filing. The appeal period for this post-trial opinion shall not begin to run until the final order is entered as an order of the Court.